## LYNCH v. UNITED STATES.

District Court, S. D. New York.

May 17, 1944.

Nelson D. Spiro, of New York City (Lawrence E. Goldman, of Kansas City, Mo., of counsel), for plaintiff.

James B. M. McNally, U. S. Atty. of New York City (Joseph C. Kenney, Asst. U. S. Atty., of New York City, of counsel), for defendant.

BYERS, District Judge.

Decision of a motion for a directed verdict made by defendant at the close of the entire case, which was then reserved.

The case was submitted to the jury, and after seven hours of deliberation they were unable to reach a verdict.

The action was brought by the administratrix of Edward H. Lynch, deceased, to recover under a War Risk Insurance policy as for total and permanent disability said to have occurred while the policy was in effect.

The original policy, having been issued in 1919 and allowed to lapse, was reinstated on April 1, 1923, and converted into a 20-payment life policy in which the plaintiff was named as beneficiary, and premiums were paid through the month of December, 1925.

It was stipulated that extended insurance in the sum of $9,598.68 was in effect as of June 26, 1926, and that a disagreement under Section 19 of the applicable statute, 38 U.S.C.A. § 445, existed and continues.

The decedent died on March 18, 1940, and while the cause of death was not disclosed, there is nothing in the evidence to suggest that it was associated with the mental condition hereinafter to be discussed.

There is no dispute over the proposition that no claim for permanent and total disability was filed by Lynch until the month of June, 1936, but that he did file claims for veteran's compensation and sought review of the denial thereof.

This suit was brought by the administratrix about three years after Edward H. Lynch's death, namely, on March 9, 1943, and recovery is sought on the theory that he was entitled to be paid for permanent and total disability dating from about May 1, 1925, until his death.

Lynch's own failure to assert such a claim between 1925 and 1936 would be consistent with an understanding upon his part that no condition of permanent and total disability could be demonstrated so as to justify recovery under the policy, if during that period of time he was mentally

qualified to hold an intelligent opinion on the subject.

The evidence presents no contested issues of fact, and the controversy comes down to the narrow question of whether the plaintiff may be said fairly to have sustained her burden of proving that a condition of total and permanent disability was shown to have arisen and continued between the years in question.

The case of the plaintiff consists in the testimony of herself as to what she observed of her husband's mental condition; and that of his sisters, Mrs. Scobie and Mrs. Law; and that of Thomas J. Burke, who was a friend of the decedent from the year 1926 until about 1930; of William D. Saksen, who knew him as a boy and who saw him between January of 1926 and February of 1927, and maybe a dozen times thereafter until 1940. He testified that in 1927 the decedent executed what was probably a quitclaim deed, or other form of conveyance of a part interest in a bungalow which several veterans owned as a kind of retreat or club house in the country.

Also that of Andrew J. McGinty, who observed him during 1926 and again in 1936 at a meeting of the Veterans of Foreign Wars; that of Harry Bochert, who was the accredited representative of the Veterans of Foreign Wars at the Veterans' Administration headquarters, and who made the acquaintance of the decedent in November of 1924, but first had business relations with him in 1931 and again in 1932 in connection with Lynch's compensation claims. (He testified that in 1936 Lynch made a claim for insurance benefits as stated.) Also that of Edward J. Devine who was the supervisor of embalmers in connection with the grave registration service in France, and who had interviews with Lynch in 1926, at which time the latter asked whether the witness in fact could state who the Unknown Soldier was, as he had in mind to write a book on the subject. Lynch also spoke to this witness about his experiences at Perry Point Hospital later to be referred to.

The government called Dr. Jacob Cohen, psychiatrist of the Central Islip State Hospital, who examined the decedent Lynch in 1936, and Dr. Arthur C. Rodgers, also a psychiatrist at the same institution; and Mrs. Effie Pieper, employed by the New York Journal American in the payroll department, who testified concerning Lynch's employment by that newspaper during 1936 and 1937.

It is necessary to understand that the only business activity of the decedent after his return from France in 1919, where he was a member of the A.E.F., was that of assisting his father, who according to the testimony was an active and successful bookmaker at various race tracks in the east down to 1938 when he died. There is no evidence that the decedent suffered any physical injury as an incident of his military service.

The nature of the decedent's assistance to his father is thus stated in the testimony of his sister, Mrs. Law:

"Well, a bookmaker, a very active bookmaker like my father, has to have a man to assist him taking the bets. They would take on an average of $30,000 worth a race. Sometimes more. At one particular day my father won $95,000. He would have a man like Dick Scobie, by brother-in-law, paying off and collecting and he would have half a dozen men like my brother Ned placing bets with other bookmakers, getting better prices. * * * They pay every man a salary. The salaries range from $10 a day to $25 or $30. If John Smith would come up to make a bet, if he got in early he got a much better price than if he got in late. He might get twenty to one on a horse. As everybody started wagering the price would be beaten down and it might go down to even money, or even less. If the card was too crowded, as you made book if your book was too rounded out on one horse the bookmaker would send outside to lay off money. My brother at that particular time was one of the men who were sent out to lay off the money. * * * He would run into the ring and make another bet. * * *

"Q. What record was kept of these transactions? Were they written down? A. These transactions were worked upon overnight and all the files were kept.

"Q. I mean of each transaction as it was made? Was a record made of the transaction? A. Yes, a little card was made.

"Q. And who signed the little card? Anyone? A. Anyone who made the bet.

"Q. When your runner took the bet out to lay it off, as you described it, was there any record made of that transaction between your brother and the other bookmaker? A. Yes.

"Q. Who signed that record? A. My brother.

\*   \*   \*   \*   \*   \*

"Q. Now that was the work that your brother did for your father during the 1927 racing season? A. My father stopped that work then. My father stopped my brother from doing that.

"Q. Did he do it at all during 1927? A. Yes.

"Q. Did your brother do it at all during 1928? A. He was stopped. No, he did not do it then.

"Q. Did he continue to go to the track in 1928? A. Yes, he did.

"Q. Did he go in business for himself? A. Yes.

"Q. Was he in business for himself again in 1929? A. No. The man who he went into business with said he lost everything and that gentleman blossomed forth with a place in Wall Street and Ned had nothing left.

"Q. Did he go to work for anyone else in 1929 at the track? A. No.

"Q. Did he go to the track every day in 1929? A. Not every day. Some days he would be sleeping too much.

"Q. But in 1926, 1927 and 1928 he went to the track during the season every day, is that right? A. Not every day, but most—whenever he was able to get there, and he also worked even when he was very nervous and we thought he could not make money in Saratoga this particular year, and I sent for Margaret and she told me he had made $30,000.

"Q. Was that in 1927? A. Yes.

\*   \*   \*   \*   \*   \*

"Q. Did you say your brother told you he made $30,000? A. Yes, he made $30,-000 and he lost it.

"Q. That is he told you that? A. Yes, he told me that."

The foregoing extended quotation is believed to be justified in order that an understanding may be had of the nature of the decedent's calling prior to his entry into the Perry Point Hospital in 1925, and of the use that he made of his time after he left that institution.

It is uncontested that in April of 1925 he was admitted to the Veterans Hospital at Perry Point, Maryland, at the instance of his father, and it is a reasonable inference that the decedent and his father had been carrying on the father's business at the Bowie race track at Baltimore at that time, and that something happened which caused the father to believe that his son's welfare required treatment at that hospital.

At the time of his admission, his condition was diagnosed as "dementia praecox catatonic type" and the prognosis was "unfavorable".

The report of the examining board indicates that at that time he was unable to resume his previous occupation because of mental disease; that he had a permanent vocational handicap and that vocational training was not feasible because of his mental disease. That statement seems not to have been illuminated, and there is nothing in the evidence dealing with the treatment which he received at the hospital during the ensuing seven months, but on November 20, 1925, he was discharged at the request of his relatives. The records indicate that as of that time he was in a state of remission, and was disoriented, very emotional, hallucinated and delusional, had no insight, and that his judgment was warped, and that he was suffering from dementia praecox and was incompetent.

The evidence of later activity of the decedent would be more informative if it presented factual data by those in a position to observe the decedent in the efforts that he made to pursue the only calling for which apparently he had been trained; that is to say, if any of the employees of his father (Mrs. Scobie's husband, who so functioned, was deceased at the time of the trial) who observed what actually took place during the years 1926, 1927 and 1928, when the decedent was at the race track, had been called as witnesses, it would be possible to reach a satisfactory conclusion as to whether the hospital authorities were correct in believing that he was disqualified from continuing his occupation.

The testimony of both Mrs. Scobie and Mrs. Law, as well as that of the plaintiff herself, is not really conclusive on that aspect of the case, for the reason that none of them attended the races themselves, and their testimony is confined to what they observed of the decedent's conduct, his habits and his manner of comporting himself in the home, and in his purely social relationships, rather than what he actually did when in attendance at the races.

There can be no doubt that from and after the decedent's release from the hospital at Perry Point, his conduct at times was irrational; that is to say, during the

fall of 1925 and during 1926 he complained that his father was ruining the business, and they had fist fights and numerous arguments. During 1927, 1928 and 1929 he had scuffles with his father. He had no affection for his older son, Mortimer, who was born in 1923. In 1931 he pointed a revolver at his wife, when he told her that, if it went off and killed her, the worst that would happen to him would be that he would go back to the insane asylum. In 1932 he had his upper teeth out, and then falsely blamed his wife for having advised him to do so. The observations of the wife from 1931 on were not continuous, because between 1931 and 1936 she and her husband lived apart most of the time for reasons of her health, although there was no legal separation and from time to time they spent days and sometimes weeks together. During 1936 he complained to his wife in Jacksonville that the Ku Klux Klan was after him.

Without reciting all incidents in detail, it is clear that the man was unbalanced and at intervals was abusive, surly, suspicious, and most difficult to live with. He practiced eccentricities of diet, and during 1927 and at other times he manifested aberrations in the matter of religious observance—he was a devout Catholic—and at times appealed to priests of his faith in a way that indicated a disturbed condition of mind.

The foregoing is gathered from the testimony of the plaintiff and from that of Mrs. Scobie, a sister of the decedent, as well as that of Mrs. Law and the other witnesses who have been named.

In 1936, on complaint of Mrs. Law acting for herself and her mother, the decedent was admitted to the Central Islip State Hospital under an emergency commitment, as the result of irrational conduct involving a display of a revolver in the presence of his mother and sister and statements by him that his fellow passengers, on his trip north from Florida by bus, had wanted to do him harm. The diagnosis was that of "psychoneurosis anxiety state", and a little over three weeks later he was approved for parole, at the instance of his mother and Mrs. Law, and the patient was released from that parole at the end of the year.

It was the opinion of Dr. Cohen that on the 15th of June, 1936, the decedent was not prevented from following any remunerative occupation; it was the opinion of Dr. Rodgers that he could engage in remunerative work but whether he could continue, the witness was unable to say.

From September 24, 1936, until April 14, 1937, the decedent was employed in the press room of the New York Journal American. He was rated as a Boy Pressman, and he did such odd jobs as were assigned to him by the foreman, which included sweeping the floor, lifting plates and similar duties. He worked on the average of two full days a week, and it does not appear that he was needed for more extended periods and was unable to respond.

In 1926 his mother purchased an automobile for him, which he drove himself. Some witnesses testified that he drove fast and not carefully, and the evidence of the duration of his automobile driving is not clear, but certainly it embraced one trip at least to Florida in 1930 or 1931, with his family. All of this means that he must be presumed to have acquired a driver's license, although none was produced on the trial. If he did, of course he made representation that he was qualified to receive it.

The evidence would be more convincing if it embraced any testimony of treatment accorded to the decedent by neurologists or psychiatrists or other practitioners in the art of mental healing, during the years which elapsed between his discharge from Perry Point in 1925 and his death about fifteen years later.

If the man himself was incapable of realizing his own unfortunate condition and to take the initiative in striving to remedy it, at least his family could reasonably be expected to do so, if they observed in him the total and permanent disability now asserted. Their failure to take remedial measures supports the inference that such were not deemed to be requisite after April of 1925, when the first hospitalization was accomplished.

The absence of any showing that medical advice was sought during these years, by a family which is not shown to have been lacking in financial resources or social relationships which would have been compatible with access to such advice, is not without significance in viewing the situation as a whole and under the restrictions that are necessarily present in so fragmentary a case.

From all of the foregoing, it will appear that about April 27, 1925, the decedent

suffered a mental impairment which was then diagnosed as "dementia praecox catatonic type"; and that in June of 1936 his condition was that of psychoneurosis anxiety-state". Between those dates he suffered at intervals from a mental impairment which was disabling at times, but not continuously, for the purposes of the calling for which the decedent was best fitted, since it appears from the testimony of Mrs. Law that during the years 1926, 1927 and 1928 he followed at times and with more or less success the occupation of bookmaker's assistant and clerk, and also that he gambled on his own account and stated that he had won and lost as much as $30,-000.

That which would be continuous in commercial or industrial occupations would not necessarily be continuous in such a calling as this or in others that come to mind; for instance, opera singers and other musicians may perform only occasionally in public during a given season and yet they may be continuously employed in their calling; dramatic performers, both upon the stage and the screen, may be continuously employed without appearing in public every day; similarly with writers, illustrators and others whose activities do not proceed on regular schedule from day to day; and so it is thought that the testimony in this case is fairly consistent with the view that a bookmaker, and therefore his assistant, during the years 1926, 1927 and 1928, would not necessarily be at a race track every day that the track operated during a given season; and that the conventional meaning of "continuously", which is interpreted as importing reasonable regularity under normal conditions, must be given application with reference to the incidents of a given employment, and that which would be regular and continuous on the part of an accountant or an office manager would not necessarily be continuous as applied to a bookmaker's clerk or assistant.

Failure to cite authorities for this decision does not mean that the cases relied upon by counsel have not been consulted, for such is not the fact. The truth is that nothing factually parallel to this record has been brought to light. It is recognized that, particularly in mental cases, spasmodic efforts to gain a livelihood are not incompatible with a permanent and total disability; once the latter has been fairly established. It is thought that this case does not fall within that category, for reasons which it has been sought to make clear.

In the absence of testimony from some of the many clerks and assistants of the decedent's father, tending to contradict the testimony of Mrs. Law as to the activities of her brother during the three years 1926, 1927 and 1928, it is concluded that the plaintiff has failed to produce evidence tending to demonstrate that her husband, Edward H. Lynch, was totally and permanently disabled from following any gainful occupation from and after May 1, 1925, continuously until the time of his death, and the defendant's motion for a directed verdict will be granted.

Settle order.